**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL 38, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO, Respondent.**

**No. 15643.**

United States Court of Appeals
Sixth Circuit.

Dec. 17, 1964.

Solomon I. Hirsh, N. L. R. B., Washington, D. C., for petitioner, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Solomon I. Hirsh, Peter M. Giesey, Attys., N. L. R. B., Washington, D. C., on the brief.

Thurlow Smoot, Cleveland, Ohio, for respondent.

Before CECIL and PHILLIPS, Circuit Judges, and TAYLOR, District Judge.*

HARRY PHILLIPS, Circuit Judge.

The Board seeks enforcement of an order directing the respondent labor union to cease and desist from certain unfair labor practices and to post compliance notices. The Board found that the Union violated Section 8(b) (4) (i) and (ii) (B) of the National Labor Relations Act, 29 U.S.C. § 158(b) (4) (i) and (ii) (B).[1] The decision and order of the Board are reported at 141 N.L.R.B. 983 (1963).

This labor dispute grew out of the construction of two apartment houses in Cleveland, Ohio, one known as Holland Gardens and the other as the Simon project. Specifically involved was the

---

* ROBERT L. TAYLOR, Chief Judge, Eastern District of Tennessee, sitting by designation.

1. "(b) It shall be an unfair labor practice for a labor organization or its agents
—* * *
"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in any industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is * * * (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 9: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing."

work of "racking"[2] electric power lines on apartment buildings.

The general contractors on both the Holland Gardens and Simon projects contracted for the racking to be done by the Cleveland Electric Illuminating Company, hereinafter called Cleveland Electric. The employees of Cleveland Electric were not members of the respondent union. The union insisted that the racking should be done by union members in the employ of two electrical subcontractors, M & K Electric Inc. and EL-O Electric Co. On May 30, 1962, a union representative told the district superintendent for Cleveland Electric that he "may have to pull the job" on the Holland Garden project if the racking work was begun by Cleveland Electric. On June 4, 1962, after Cleveland Electric had begun work on the racking, a number of union electricians employed by subcontractor M & K Electric Inc. walked off the job, following a conference with a union representative named Seiholzer, and did not return until June 8. The board adopted the following finding of the trial examiner:

"Accordingly, I find that the Respondent induced or encouraged M & K electricians to quit the Holland Gardens job on June 4, because of the presence of the CEI 'racking' crew, that its immediate object was to force M & K to cease doing business with Holland until it assigned the racking work to M & K, and that Respondent's ultimate object was to force Holland to cease dealing with CEI, insofar as the racking work was involved. I find therefore that, by Seiholzer's inducement or encouragement of the M & K electricians to leave the job, the Respondent violated Section 8(b) (4) (i) and (ii)

(B) of the Act. I find further that, by Seiholzer's aforementioned threat to Swartz to strike the Holland Gardens job, the Respondent violated Section 8(b) (4) (ii) (B) of the Act."

When Cleveland Electric began the racking work on the Simon project, union employees of EL-O Electric Co. removed from the walls the vertical wires and the service pipes which enclosed the wires. The intermediate report contains the following findings:

"The removal of the foregoing service wires (and pipes) necessarily prevented the furnishing of electrical services to the individual apartments, thereby rendering nugatory CEI's racking work. When Simon appealed to EL-O's foreman, Shaw, to restore the service wires, the latter reported that the electricians refused to do so.

\* \* \* \* \* \*

"In any event, the removal of the service wires, clearly violated Section 8(b) (4) (ii) (B) of the Act, as it constituted coercive conduct with an object of disrupting business relations between Simon and CEI until the racking work was assigned to the EL-O electricians.

\* \* \* \* \* \*

"In view of all the foregoing considerations, I find that it was at least one of the Respondent's objectives, in ordering the removal of the service wires, to force EL-O not to make certain installations for Simon (the attachment of the service wires to the racking) until Simon assigned the racking work to EL-O and to force Simon to cease doing business with CEI insofar as the racking work was involved."

2. The Board's brief explains the meaning of "racking" as follows: "The term 'racking' describes one of two common ways of bringing electric power from a utility pole to each apartment in a building. A wire is 'looped' from the pole to the nearest point of the building, and is then run horizontally ('racked') along the exterior wall of the building to connect with the service pipes serving the individual apartments. The other method is simply to 'loop' a wire from the utility pole directly to the service pipe of each apartment. The method used in any building is a matter of choice for the builder, and is determined by esthetics, safety and cost."

The Board found that the union violated § 8(b) (4) (i) and (ii) (B) of the Act by inducing and encouraging employees of EL-O Electric Co. and M & K Electric, Inc. to engage in a strike or a refusal in the course of their employment to perform services, thereby coercing and restraining these two subcontractors with an object of (1) forcing or requiring them to cease doing business with Holland and Simon respectively, and (2) forcing Holland and Simon to cease doing business with Cleveland Electric.

The Board further found that the union violated Section 8(b) (4) (ii) (B) of the Act by threatening M & K Electric Inc. with a strike of its members, with an object of forcing M & K Electric to cease doing business with Holland, and Holland to cease doing business with Cleveland Electric.

█ We hold that the findings of the Board and the inferences drawn therefrom are supported by substantial evidence on the record as a whole. See N. L. R. B. v. Cuyahoga, Lake, Geauga & Ashtabula Counties Carpenters District Council, 338 F.2d 958 (C.A. 6) (November 17, 1964).

█ As said by this court in Ohio Valley Carpenters District Council, United Brotherhood of Carpenters and Joiners of America, AFL-CIO v. N. L. R. B., 339 F.2d 142 (C.A. 6) (November 19, 1964):

"[I]f a union demands that a contractor do something he is powerless to do except by ceasing to do business with somebody not involved in the dispute, it is manifest that an object of the union is to induce this cessation of business."

We find substantial evidence on the record that union officials made it clear to all the employers involved that they would not perform services for M & K Electric Inc. and EL-O Electric Co. unless the racking work was taken away from Cleveland Electric and awarded to the two electrical subcontractors.

The Board's order directs the union to cease and desist from:

"Engaging in, or inducing any individual employed by EL-O Electric Co., or M & K Electric, Inc., or any other person to engage in, a strike or refusal in the course of their employment to perform services, and coercing or restraining the foregoing employers or any other person by such conduct or by threats thereof, with an object of forcing the foregoing employers or any other person to cease doing business with Holland, S. Simon Construction Company or any other person, or of forcing Holland, Simon or any other person to cease doing business with The Cleveland Electric Illuminating Company."

█ The union contends that this order is too broad under the circumstances and that the words "any other person" should be stricken from the order at all places where they appear. This case involves five employers and work stoppages or failure to perform services at two separate projects. We hold that under the facts and circumstances of this case the Board, in including the words "any other person" in the order, did not abuse its broad power to determine the necessary scope of its orders and to restrain other violations "the danger of whose commission in the future is to be anticipated from conduct in the past." N. L. R. B. v. United Mine Workers of America, 195 F.2d 961 (C.A. 6), cert. denied, 344 U.S. 920, 73 S.Ct. 387, 97 L.Ed. 709.

All other contentions made by the respondent union in its brief and argument have been considered and found to be without merit.

Enforcement of the order of the Board is granted.